NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER

**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000327
27-DEC-2019
07:50 AM**

NO. CAAP-19-0000327

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF G CHILDREN

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 17-00122)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Fujise and Chan, JJ.)

Appellant Mother (**Mother**) appeals from the Order Terminating Parental Rights, filed on March 29, 2019, in the Family Court of the First Circuit (**Family Court**),[1] which terminated Mother's parental rights to her children, XG, EG, and ZG (collectively "**Children**"). Mother also challenges the "Findings of Fact and Conclusions of Law" entered on May 8, 2019 by the Family Court.

Mother challenges Findings of Fact (**FOF**) Nos. 28, 53 through 74, 76, and 77, and Conclusions of Law (**COL**) Nos. 9 and 10. Mother contends there was not clear and convincing evidence to support the Family Court's determination that she was not presently able to provide a safe family home, even with the assistance of a service plan, and that it was not reasonably

---

[1] The Honorable Linda S. Martell presided.

foreseeable that she would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time. Mother specifically claims FOF Nos. 53 to 57, regarding her inability to meet the children's immediate needs, are clearly erroneous because she could provide housing, she was employed at the time of trial, and she had a caregiver for the Children while she worked. Mother also claims FOF Nos. 58 to 62, regarding her inability to demonstrate appropriate parenting, are clearly erroneous because her inconsistent visitation was due to her employment and illness; she had explained at trial the reasons for her "inappropriate" behavior during visits; and she was not provided an opportunity to have all of the Children in her care at the same time. Mother argues FOF Nos. 63 to 66, regarding her limited insight into safety issues, are clearly erroneous because she testified she needed all of the recommended services outlined in her psychological evaluation. Lastly, Mother contends FOF Nos. 67 to 74, regarding her pattern of failing to complete services, are clearly erroneous because she complied with all of the court ordered services that were made available, she was on a waiting list for one service at the time of trial because of delayed referral, and hands-on parenting was prematurely stopped.

Based on our careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's points of error as follows and affirm.

## Standards of Review

Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation omitted).

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
>
> On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.

Id. (citation and internal quotation marks omitted).

"[T]he family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal." In re Doe, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003) (internal quotation marks and brackets omitted) (citation omitted).

Further, "it is not the province of the appellate court to reassess the credibility of the witnesses or the weight of the evidence, as determined by the family court[.]" In re Doe, 95 Hawai'i 183, 197, 20 P.3d 616, 630 (2001) (citation omitted).

### Discussion

Mother challenges FOF Nos. 53 to 57, related to her inability to meet the Children's immediate needs, as clearly erroneous. Mother argues at the time of trial, she was employed and had an apartment which the Department of Human Services (**DHS**) failed to verify and visit and the various caregivers she left the Children with were the same persons DHS approved as foster parents.

The Family Court's finding that Mother could not provide for the immediate needs of the Children was not clearly erroneous. It is undisputed that Mother was employed and had housing at the time of trial. However, Mother testified she

started her job the week prior to trial and struggled to maintain any job for more than six months. Michael Tovey (**Tovey**), a DHS Human Service Professional III, was qualified as an expert in child welfare services and testified it was unknown and questionable whether Mother could provide food and diapers for the Children because of the number of jobs she had, jumping from one to another. Tovey testified past behavior and history are indicators of what is likely to happen in the future. Tovey also testified that DHS did not visit Mother's home because she was not close to reunification with the Children. Tovey's testimony was found credible and Mother's testimony was found not credible in this regard. See FOF Nos. 93 and 96.

In this case, DHS was not concerned with the individuals providing care for the Children, but rather the manner in which Mother left the Children with others without providing for their immediate needs and a legal caretaker. In FOF Nos. 6, 7, and 32, which are not contested on appeal, the Family Court found:

> 6. On March 23, 2017, DHS received a report of alleged physical abuse of [XG] and threat of abuse to [EG]. It was reported that [XG], then three years old, had been residing with an unrelated caretaker since the age of three months. Mother recently took [XG] back for seven days, and when she returned him to the caretaker, [XG] presented with bruising on both butt cheeks. [EG], then almost one year old, was reported to be living with different unrelated caregiver since [EG] was just days old.

> 7. DHS confirmed physical abuse of [XG] and the threat of abuse of [EG].

> . . . .

> 32. The Children are vulnerable due to their young ages, being completely dependent on adult caretakers to meet their needs.

On June 28, 2017, DHS initially requested foster custody of XG and EG and family supervision of two-month-old ZG. One factor for DHS requesting foster custody was that XG's caretaker had to take him to the emergency room because she did

not have legal documentation to take him to a pediatrician. In Exhibit 16, a letter to the court dated October 9, 2017, DHS noted that "DHS was also informed that [Mother] would often leave [ZG] with the resource caregiver for [EG] for three or four days in a row overnight" and that "[a]ccording to [EG's] caregiver, [Mother] rarely informed her when she would return to pick up [ZG]." On October 16, 2017, the Family Court revoked family supervision and DHS assumed foster custody of ZG due to Mother's lack of engagement in services and leaving ZG with EG's caregiver for three to four days in a row and without a legal caretaker.

Mother continued to have unaddressed safety concerns demonstrated by her inconsistent visits with the children. Tovey testified it would be months before DHS would be comfortable giving Mother unsupervised overnight visits. At trial, when Mother was questioned about leaving her children with others, she denied that she ever left her children with a caregiver for more than twenty-four hours.

Based on the evidence in the record, and the credibility determinations made by the Family Court, FOF Nos. 53 through 57 are not clearly erroneous.

Mother claims FOF Nos. 58 to 62 are clearly erroneous because her inconsistent visitation was due to her employment and illness and that she was not provided an opportunity to have all of the Children in her care at the same time. FOF Nos. 58 to 62 related to the Family Court's finding that Mother was unable to demonstrate consistent appropriate parenting and had unaddressed anger management issues which placed the Children at risk of harm.

A DHS Short Report, dated February 5, 2019, stated Mother was inconsistent with visits since November 2018, attending three out of eight weekly visits, Mother missed a visit on January 7, 2019 because she claimed to be sick but social media posts showed her exercising outside and getting a haircut

at a salon. Mother stated she was "not going to be able to make it" and her "face was swollen" as reasons for cancelling other visits. Mother testified that she cancelled the January 7, 2019 visit because she was sick, denied she posted pictures of her exercising, stated people should not be snooping around on her day off or when she is sick, and she got a haircut that day because she wanted to get a haircut. Although Mother testified she missed visits due to work or illness, the Family Court found her testimony was not credible in this regard. See FOF No. 96.

Contrary to Mother's claim, DHS provided Mother with the opportunity for visits with all three children at the same time. Ohana Time Reports for February 27, March 6, April 3, May 1, May 8, May 22, June 25, July 3, July 10, July 31, and August 7, 2018 indicate all three children were present during Mother's visits. The Ohana Time visits on April 17, April 24, May 29, June 5, June 12, June 19, July 17, September 25, and October 2, 2018, which indicated that all the children were scheduled to visit with Mother, were cancelled at her request or because she failed to confirm the visits as required by DHS.

Another DHS Short Report, dated March 5, 2019, stated that on March 4, 2019, Mother could not control her anger and became verbally abusive after a DHS aide gave Mother a direction that Mother perceived to be an attack on her as a parent. This incident occurred two days before Mother testified at trial that she did not believe there are any safety concerns with her parenting and that she had resolved her anger management issues. The March 4 incident demonstrated Mother had not resolved her anger management issues after completing anger management classes on November 26, 2018. Therefore, FOF Nos. 58 to 62 are not clearly erroneous.

Mother argues FOF Nos. 63 to 66 are clearly erroneous because she testified she needed all of the recommended services outlined in her psychological evaluation. FOF Nos. 63 to 66

6

relate to the Family Court's finding that Mother had limited insight and understanding of the safety issues which placed the Children at risk of harm. Mother testified she agreed with the recommendations that she needed individual psychotherapy, parenting education, Parent-Child Interaction Therapy (**PCIT**), and couples therapy. However, Mother later testified she completed parenting education and anger management and did not need anything more. Mother admitted individual therapy was supposed to be every two weeks but she did not see her therapist every two weeks "[b]ecause I didn't go[,]" and does not believe there are any safety concerns with her parenting or anger management issues. As discussed above, Mother had a variety of safety issues that were unresolved although Mother believed otherwise. Thus, the record supports the Family Court's findings that Mother lacked insight and understanding of the safety issues which placed the Children at risk of harm. FOF Nos. 63 to 66 are not clearly erroneous.

Mother claims FOF Nos. 67 to 74 are clearly erroneous because she complied with all of the court ordered services that were made available, she was on a waiting list for one service at the time of trial because of a delayed referral, and hands-on parenting was prematurely stopped. FOF Nos. 67 to 74 relate to the Family Court's finding that Mother had a pattern of failing to complete services. Mother completed parenting education, domestic violence/anger management classes, and a psychological evaluation. See FOF No. 71. However, as Mother admitted above, she failed to attend bi-weekly individual therapy because she "didn't go." Mother's failure to participate in Intensive Home Based Services (**IHBS**) while ZG was under family supervision prompted DHS to request foster custody of ZG. DHS made referrals for hands-on parenting and couples counseling in November 2018, and a DHS Comprehensive Counseling and Support Services worker made multiple attempts to engage Mother but she cancelled a

scheduled appointment and was a no-show for a second one. The services only began after an intake meeting on February 12, 2019. While Mother was participating in services at the time of trial, the record shows that she had a pattern of delaying timely participation and completion of services.

On October 15, 2018, the Family Court issued an Order Terminating Parental Rights which terminated Mother's parental rights to the Children after Mother failed to appear. On November 28, 2018, the Family Court granted Mother's November 5, 2018 "Motion to Set Aside Default and Order Entered on October 15, 2018 Granting DHS Motion to Terminate Parental Rights." Thus, Mother had to be re-referred for services in November 2018, after her default was set aside. Tovey stated PCIT was scheduled to start in October 2018, but Mother's parental rights were terminated due to her default so she had to be placed back on the waitlist in December 2018. Although Mother's default was set aside, it was her misunderstanding about appearing in court that was the basis for termination of her parental rights and which resulted in the court ordered services being stopped. The delay in participation and completion of services was due to Mother's conduct. Therefore, based on the record, FOF Nos. 67 through 74 are not clearly erroneous.

Given the record in this case, the Family Court was not wrong in its COL Nos. 9 and 10, that there was clear and convincing evidence that Mother was not presently willing and able to provide a safe family home for Children, even with the assistance of a service plan, and it was not reasonably foreseeable that Mother would become willing and able to provide a safe family home for Children, even with the assistance of a service plan, within a reasonable time. XG and EG were first placed in foster custody on July 24, 2017. ZG was first placed in foster custody on October 16, 2017. DHS first became involved after XG was bruised from being disciplined by Mother and after

8

Mother failed to provide XG and EG with adequate food, shelter, and access to medical care, and frequently left them without a legal caretaker. Family Supervision for ZG required Mother's participation in IHBS. On October 3, 2017, Mother's participation in IHBS was closed due to lack of participation, which then caused DHS to request foster custody of ZG. Since February 9, 2018, Mother was required to participate in CCSS with parenting education, domestic violence/anger management intervention, individual psychotherapy with trauma-informed approach, couples therapy, and PCIT. Mother admitted individual therapy was supposed to be every two weeks but she did not see her therapist every two weeks "[b]ecause I didn't go." At the time of trial, Mother had completed only parental education and domestic violence/anger management. Mother testified she needed parenting education and anger management, which she completed, but did not need anything more. She also did not believe there are any safety concerns with her parenting and that she resolved her anger management issues. However, after she completed anger management classes in November 2018, she still had anger management issues as evidenced by a January 2019 telephone call, in which she became angry, frustrated, and very defensive when asked about missed visits and another January 2019 telephone call in which Mother could be heard in the background swearing and yelling. As discussed above, two days before trial, Mother could not control her anger and became verbally abusive after a DHS aide gave her a direction she perceived to be an attack on her as a parent.

Also as noted above, Mother's visits with the Children were inconsistent when visits were cancelled on April 17, April 24, May 29, June 5, June 12, June 19, July 17, September 25, and October 2, 2018. After trial began, Mother cancelled a March 11, 2019 morning visit without notice after confirming the visit over the weekend and then she failed to confirm a visit on March 18, 2019 so it was cancelled. Mother also failed to progress to

unsupervised visits because DHS did not observe consistency in visits and services, engagement in services, and application of skills learned through services.

Mother also lacked basic insight into the reason why DHS was involved and denied she had any outstanding safety concerns.  Mother testified it was her understanding DHS only got involved because XG had a bruise and is not sure why the Children are still not with her, she did not have anger management problems after finishing classes, and she denied leaving her children with another caregiver for more than 24 hours at a time.

There was also clear and convincing evidence it was not reasonably foreseeable Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time, not to exceed two years from the Children's date of entry into foster care.  The Family Court's FOF 40 found, and Mother does not challenge, that at the time Mother's parental rights were terminated, XG and EG had been in foster care for almost 23 months and ZG had been in foster care for nearly 18 months.[2]  Tovey testified it was not reasonably foreseeable Mother would become willing and able to provide a safe family home within a reasonable period of time, even with the assistance of a service plan, because Mother was given multiple opportunities to engage in services but did not engage, so the services were closed and Mother needed to be re-referred.  Mother also continued to have unaddressed safety concerns, particularly anger management, inconsistency with visits, and prolonging of services.  Tovey stated Mother could take another six months to transition the Children to her home, and only if Mother was consistent with services.  However, based on Mother's history of slow progress, Tovey could not estimate how long it would take for reunification with Mother but opined

---

[2]  We note that given the Family Court's findings that XG and EG entered foster care on July 24, 2017, it appears they had been in foster care for about 20 months.  Further, ZG entered foster care on October 16, 2017 and appears to have been in foster care for about 17 months.

it was not likely in the foreseeable future.  Based on the evidence, reunification was reasonably expected to exceed two years from the date the Children first entered foster care.

In sum, the Family Court did not clearly err in regard to the FOFs challenged by Mother, and the Family Court was not wrong in its COL Nos. 9 and 10.

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, filed on March 29, 2019, in the Family Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawai'i, December 27, 2019.

On the briefs:

Tae Chin Kim,
for Mother-Appellant.

Kellie M. Kersten,
Julio C. Herrera,
Patrick A. Pascual,
Erin L.S. Yamashiro,
Deputy Attorneys General,
Department of the Attorney
General,
for Petitioner-Appellee.

Chief Judge

Associate Judge

Associate Judge

11